## WOMACK v. CONSOLIDATED TIMBER CO.

No. 522.

District Court, D. Oregon.

Dec. 1, 1941.

626

James Landye, of Portland, Or., for plaintiff.

Robert W. Maxwell, of Seattle, Wash., and Philip Chipman, of Portland, Or., for defendant.

JAMES ALGER FEE, District Judge.

This action was filed by plaintiff on his own behalf and as assignee of the claims of other employees of defendant in cookhouses operated by defendant near its logging camps, based upon the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C. A. § 201 et seq. Pre-trial conferences were held and a pre-trial order was signed by the court. Subsequently, the cause was tried by the court without a jury.

The pre-trial order was drafted jointly by the attorneys for the respective parties and is here set out in full as an excellent example of such an order.[1] The agreed facts

[1] This cause came on regularly for pre-trial before the Honorable James Alger Fee, District Judge, on April 7, 1941. Plaintiff was represented by Mr. James Landye, one of his attorneys, and defendant was represented by Mr. Robert W. Maxwell, of Seattle, Washington, and Mr. Philip Chipman, of its attorneys.

Based upon the proceedings had at said pre-trial hearing, it is

Ordered that the following matters are admitted as to the issues framed by the complaint herein and the answer to the complaint:

I. This is an action brought under and by virtue of an Act of Congress by the United States for the regulation of commerce among the states, to wit, the Fair Labor Standards Act of 1938, 29 U.S. C.A. §§ 201–219 inclusive.

II. The complaint contains five causes of action for wages alleged to be due plaintiff and four assignors of plaintiff from defendant. The claims of the four assignors of plaintiff have been duly and properly assigned by said assignors to plaintiff.

III. The parties have entered into the following stipulation of facts which have been agreed to be the facts on which this action is based:

"The parties hereto, represented by their respective attorneys, hereby enter into the following stipulation of facts:

"I. Defendant, Consolidated Timber Company, is a corporation organized and existing under the laws of the State of Michigan, qualified to do business in the State of Oregon. It owns timberlands and is engaged in the business of logging in Washington and Tillamook Counties, Oregon, with headquarters at Glenwood, Washington County. Defendant employs a logging crew, which is engaged in falling and bucking timber and loading it on cars, and operates a logging railroad which connects with a common carrier railroad. Defendant also has certain contracts with independent contractors who log parts of its timber and deliver logs to defendant at specified points, where defendant transports them by railroad to the common carrier railroad. A small percentage of the logs cut and produced by defendant is sold locally to mills located in Washington County, Oregon, and is there manufactured into lumber. By far the larger proportion of the logs produced by defendant is, however, transported by common carrier railroads to a point on the Willamette Slough in Multnomah County, Oregon, where the logs are dumped into the water and rafted. Defendant sells the rafts of logs to various sawmills, about 80 per cent of them going to sawmills in Oregon and about 20 per cent to sawmills in Washington. All sales are made and completed entirely within the State of Oregon and the purchasers send tugboats to pick up the rafts of logs which they have purchased and transport them to their mills wherever located. The logs are then manufactured into lumber by the purchaser mills and in each instance at least 70 per cent of the lumber manufactured from said logs moves in interstate commerce.

"II. Between October 24, 1938, and June 28, 1940, defendant operated what is known in logging parlance as a cookhouse at Glenwood, Oregon. The cookhouse consisted of a kitchen and dining room in a building separate and apart from the other buildings of defendant. Defendant's employees were permitted, but not required, to use the facilities of the cookhouse. Meals were then sold to them at fixed rates of 45 cents per meal for em-

are concisely stated and the issues are clear cut for decision, and documents necessary for the determination were marked and listed therein. Such an outstanding consolidated pleading requires special commendation of the draughtsmen.

Shortly stated, the question is whether these employees are covered by the provi-

ployees and 50 cents per meal for strangers. Those employees who used the facilities of the cookhouse had deducted from their wages the cost of the meals taken by them. Strangers paid for their meals in cash. Said cookhouse in Glenwood, Oregon, was used not only by employees of defendant, but also by employees of logging companies under contract with defendant, employees of some independent businesses operated at Glenwood, and others. Many of defendant's employees lived in Glenwood and ate at home. The greater proportion of defendant's employees did not use the facilities of the cookhouse. For example, during a typical month in which defendant employed 302 persons, 217 men regularly used defendant's cookhouse. Of these, 110 were employees of defendant (including 18 cookhouse employees), 101 were employees of logging companies under contract with defendant, and 6 were employees of independent businesses operated at Glenwood; 192 employees of defendant did not use the cookhouse facilities. During the same typical month, 302 meals were served to strangers.

"III. Subsequent to June 10, 1940, defendant opened and has since operated a cookhouse at a point known as Camp 2 located approximately 17 miles southwest of Glenwood. This cookhouse consists of a kitchen and dining room in a building separate and apart from other buildings of defendant. The facilities of this cookhouse are used by substantially all of defendant's employees at Camp 2, as it is the only practicable facility for eating at Camp 2. No employee, however, is required to eat there, and some employees occasionally go back to Glenwood, 17 miles away, for their meals, though this is rarely done. The said cookhouse is also used by employees of contractors of defendant and by the few members of the public who come to Camp 2. Meals are paid for at the same rates and in the same manner as was done at Glenwood.

"IV. At all times herein mentioned, defendant's operations were subject to a collective bargaining agreement between Columbia Basin Loggers, an employers' organization of which defendant was a member, and Columbia River District Council No. 5, Lumber and Sawmill Workers' Union, affiliated with International Woodworkers of America (C.I.O.), of which substantially all of defendant's employees were members. By the provisions of said working agreements, one dated May 22, 1937, and the other dated September 10, 1940, it was provided, among other things:

" 'Article XV—Cook House Operation on Basis of Cost:

" 'Employer-operated cook houses shall be conducted upon the basis of cost, it being the purpose hereof that such cook houses shall be self-sustaining but shall not earn a profit. Price of meals charged employees in such cook houses shall be based upon the principle here announced, and such price in each operation shall be settled by negotiation between the Employer and the Plant Committee.'

"V. Plaintiff, and the assignors of plaintiff, in the second to fifth causes of action, are and have been employed in both of defendant's cookhouses, plaintiff as a baker and plaintiff's assignors as dishwashers, kitchen helpers and second cook. Their duties consisted of preparing food and operating the kitchen. The food is served to and sold to defendant's employees and others who use the cookhouse at the rates hereinbefore set out. Plaintiff and plaintiff's assignors had been paid by defendant a fixed monthly wage for a 26-day month. Substantially all other employees of defendant are paid by the hour. Plaintiff and plaintiff's assignors perform no services for defendant other than in said cookhouse.

"VI. Defendant employs from 275 to 315 employees. All of defendant's employees (other than salaried employees) engaged in its logging operations are employed on a 40-hour week, and have been at all times since October 24, 1938, and all of said employees are paid time and one-half for all time in excess of 40 hours per week. Defendant, however, employs a limited number of employees on a monthly basis at an agreed monthly wage, including plaintiff and the assignors of plaintiff. The cookhouses in which plaintiff and plaintiff's assignors are employed are customarily operated seven days per week, although the logging operations are carried on only five days per week, for the reason that some of those using the cookhouse desire to have its accommodations available even when the logging operations are not running (the cookhouse being operated by a skeleton crew when operations are down).

"VII. [This paragraph of the stipulation relates to correspondence relating to the enforcement policy adopted by the Administrator of the Fair Labor Standards Act and is omitted.]"

sions of 7(a) of the Fair Labor Standards Act of 1938 or are specifically exempt therefrom by the provisions of Section 13.

. Even in an establishment where the employer is engaged in commerce or in the production of goods for commerce, a par-

IV. The hours worked by plaintiff and the assignors of plaintiff are as shown in Exhibits 7, 8, 9, 10, and 11.

V. The regular monthly compensation of plaintiff, Ivan Womack, was $125.00; the regular monthly compensation of Robert Vandehey was $85.00; the regular monthly compensation of Marion B. Vandehey was $85.00; the regular monthly compensation of Floyd Calloway was $85.00; and the regular monthly compensation of Charles Chapman was $125.00, except that in each instance an additional sum of 40¢ per day was paid, effective December 1, 1940. In addition to their regular monthly salaries, plaintiff and the assignors of plaintiff were allowed board and room in the reasonable values shown on Exhibits 1, 2, 3, 4, and 5, which are agreed to be correct.

VI. It is agreed that if plaintiff is entitled to recover an attorney's fee hereunder, the sum of $500.00 is a reasonable fee for the services of plaintiff's attorneys.

VII. It is agreed that, if plaintiff is entitled to recover for overtime claimed due, plaintiff is also entitled to recover double said amount as liquidated damages, in accordance with section 16(b) of the Wage and Hour Act. [Amendment by Consent of Parties April 19, 1941].

It is further ordered that the contested issues to be submitted to the court for determination in connection with the issues framed by this pre-trial order are as follows:

I. Plaintiff contends that plaintiff and the assignors of plaintiff are covered by the provisions of the Fair Labor Standards Act of 1938, and particularly by Section 7(a) thereof.

Defendant contends that plaintiff and the assignors of plaintiff are not covered by the Fair Labor Standards Act of 1938 and are specifically exempt from the provisions of Section 7(a) of the Fair Labor Standards Act of 1938 by Section 13 of the Fair Labor Standards Act of 1938.

This issue involves a mixed question of law and fact to be determined upon the trial. The parties will supplement the stipulation of facts by some explanatory testimony.

II. If it be held that plaintiff and the assignors of plaintiff are covered by the provisions of the Fair Labor Standards Act of 1938, the following issues are submitted with respect to the computation of overtime due, if any, to plaintiff and to the assignors of plaintiff.

1. In addition to their monthly compensation plaintiff and the assignors of plaintiff were allowed board and room in the reasonable values shown in Exhibits 1, 2, 3, 4, and 5. Plaintiff contends that for the purposes of computation of overtime the monthly compensation of plaintiff and the assignors of plaintiff should be their regular monthly salary plus the reasonable value of board and room. The defendant contends that for the purposes of computation of overtime only the regular monthly salary of plaintiff and the assignors of plaintiff should be used.

By way of illustration, plaintiff contends that the regular monthly salary of plaintiff, Ivan Womack, for the month of October, 1938, was $125.00, plus $35.10, or a total of $160.10. Defendant contends that the monthly salary of plaintiff, Ivan Womack, for October, 1938, was $125.00.

2. Plaintiff contends that in the first instance the overtime due plaintiff and the assignors of plaintiff from defendant should be computed by the following method of computation:

The monthly compensation of plaintiff and the assignors of plaintiff should be multiplied by twelve and then divided by fifty-two to obtain the weekly compensation. The weekly compensation thus resulting should be divided by forty-four for the year ending October 28, 1939, by forty-two for the year ending October 28, 1940, and by forty for all work subsequent to October 28, 1940, in order to determine the hourly compensation. Plaintiff and the assignors of plaintiff would have due them under this method of computation one and one-half times the hourly compensation for each hour worked in excess of forty-four hours per week during the year ending October 28, 1939, forty-two hours per week during the year ending October 28, 1940, and forty hours per week subsequent to October 28, 1940.

To illustrate this method of computation there is appended the following examples taken from Exhibit A attached to the complaint for the week ending November 4, 1938, worked by plaintiff, Ivan Womack. Ivan Womack's regular rate of wages was $125.00 per month. For said month of November, 1938, the reasonable value of the board and room given to said plaintiff, Ivan Womack, was $33.75. Therefore, according to plaintiff's contention, as shown in paragraph

ticular employee there who is not so engaged does not fall under the act. Specific exemption is given to all employees "engaged in any retail or service establishment the greater part of whose selling or servicing is in interstate commerce". *29 U.S.C.A.* § 213(a) (2). The applicability of this exemption depends according to orthodox in-

1 hereof, his monthly compensation was $158.75. The method of computation is as follows:

Example A. On assumed monthly salary of $158.75.

12 X $158.75 = $1905.00.

$1905.00÷52 = $36.63 (weekly compensation).

$36.63÷44 = 83¼ cents (hourly compensation).

Overtime—21 hours X 83¼ cents X 1½ = $26.22.

Example B. On assumed monthly salary of $125.00

12 X $125.00 = $1500.00,

$1500.00÷52 = $28.85 (weekly compensation),

$28.85÷44 = 65½ cents (hourly compensation),

Overtime—21 hours X 65½ cents X 1½ = $20.63.

3. As an alternative method of computation, plaintiff submits that under the contract between the labor organization representing plaintiff and the employer's organization representing defendant, the monthly compensation given plaintiff by defendant was based on an assumed 48-hour week. The hourly compensation of plaintiff and the assignors of plaintiff is then determined by dividing the weekly compensation by 48 and paying additional half time for hours worked per week between 44 hours and 48 hours up to October 28, 1939, between 42 hours and 48 hours up to October 28, 1940, and between 40 hours and 48 hours since October 28, 1940, and paying one and one-half times said hourly rate for all hours worked per week in excess of 48 hours.

Applying this method of computation to the same examples as used in subparagraph 2 hereof, the following results are reached:

Example A. On assumed monthly salary of $158.75.

12 X $158.75 = $1905.00,

$1905.00÷52 = $36.63 (weekly compensation),

$36.63÷48 = 76¼ cents (hourly compensation),

4 hours at ½ X 76¼ cents = $ 1.53

11 hours at 1½ X 76¼ cents = $12.58

———

$14.11

Example B. On assumed monthly salary of $125.00.

12 X $125.00 = $1500.00,

$1500.00÷52 = $28.65 (weekly compensation),

$28.65÷48 = 60 cents (hourly compensation),

4 hours at ½ X 60 cents = $ 1.20,

11 hours at 1½ X 60 cents = $ 9.90,

———

$11.10

4. Defendant contends that the monthly compensation paid plaintiff and the assignors of plaintiff by defendant was intended to and did cover all hours worked in excess of 40 hours per week at one and one-half times the regular rate of pay and that there is no overtime compensation due plaintiff or the assignors of plaintiff from defendant.

5. Alternatively, defendant contends that if the method of computation shown in subparagraph 4 hereof be not accepted, then the overtime due plaintiff and the assignors of plaintiff, if any, should be computed by the following method:

The monthly compensation should be multiplied by 12 and then divided by 52 to obtain the weekly compensation. The weekly compensation thus resulting should be divided each week by the number of hours worked during that week to determine the hourly compensation. Plaintiff and the assignors of plaintiff would have due them under this method of computation one-half times the hourly compensation for each hour worked per week in excess of *forty-four during the* year ending October 28, 1939, forty-two hours during the year ending October 28, 1940, and forty hours subsequent to October 28, 1940.

This is the method of computation set forth in Interpretative Bulletin No. 4 (July, 1940, issue) issued by the Wage and Hour Division of the United States Department of Labor, paragraph 12, which reads as follows:

"If an employee earns $23 per week but works a fluctuating number of hours, his regular rate of pay will be the average hourly rate each week. Suppose that during the course of four weeks the employee works 42, 46, 49, and 43 hours. His regular hourly rate of pay each week is approximately 55 cents, 50 cents, 47 cents, and 54 cents, respectively. For the first week the employee is entitled to be paid $23; for the second week $24 ($23 ÷(4 hours X 25 cents)) or ((42 hours X 50 cents)÷(4 hours X 75 cents)); for the third week approximately $24.67 ($23 ÷(7 hours X 23 ½ cents)) or ((42 hours X 47 cents)÷(7 hours X 70½ cents)); for the fourth week approximately $23.27

terpretation upon "whether the particular establishment possesses the characteristic of a retail or service establishment". 

■ The particular employee, then, is not within the act if he is not engaged in commerce or the production of goods for commerce, and is specifically exempted if the establishment in which he works is mostly selling or servicing in intrastate commerce.

The cook, dishwasher or waiter employed by a company to feed a crew producing logs for interstate shipment is an integral part of the crew and is producing goods for commerce under the definition of the act, where the company furnishes the food and makes no deduction therefor from the wages of the timber workers. Philadelphia, Baltimore & Washington Railroad Company v. Smith, 250 U.S. 101, 39 S.Ct. 396, 63 L.Ed. 869, although under a different statute, is persuasive by analogy upon this point.

However, that decision throws no light upon the clear-cut exemption granted by this Act. To the existence of the exemption, the court now turns.

The restaurant, the cafeteria and the roadside diner are each a typical example of a service establishment which is local in character and renders a service to private individuals for direct consumption at a retail price. (Interpretative Bulletin No. 6, Sections 23 and 24). Even though a cafeteria is operated in a factory by employees of a common employer with the factory workers who are producing goods for commerce, it may still be a service establishment. (Interpretative Bulletin No. 6, Section 39).

There are several factors pertinent to each of these establishments. A cookhouse is a restaurant or roadside diner and, therefore, a typical service establishment. A service was rendered in a physically separate establishment where meals were sold at retail to, and the facilities of the establishment were placed at the disposal of, private individuals for direct consumption and use. Persons not in the employment of defendant or companies under contract with defendant were served upon the same terms as persons so employed, except that the price was higher for the former. Employees of logging companies under contract with defendant were served. There was no requirement that defendant's employees patronize either cookhouse. Those employees who were served in the cookhouse were charged a price for the meals eaten, which

($23÷(1 hour X 27 cents)) or ((42 hours X 53.5 cents)÷(1 hour X 81 cents))." 

Applying this method of computation to the same examples as used in subparagraphs 2 and 3 hereof, the following results are reached:

Example A. On assumed monthly salary of $158.75.

12 X $158.75 = $1905.00,

$1905.00÷52 = $36.63 (weekly compensation),

$36.63÷65 = 56½ cents (hourly compensation),

21 hours at ½ X 56½ cents = $5.93

Example B. On assumed monthly salary of $125.00.

12 X $125.00 = $1500.00,

$1500.00÷52 = $28.85 (weekly compensation),

$28.85÷65 = 44½ cents (hourly compensation),

21 hours at ½ X 44½ cents = $4.67.

These issues as to computation involve mixed questions of law and fact to be determined upon the trial. The parties will supplement the stipulated facts by some explanatory testimony.

### Exhibits

At the pre-trial the following exhibits were introduced without objection by either party and may be introduced at the trial. Each of the parties has reserved the right to offer further exhibits at the trial subject to the discretion of the court:

Exhibits Introduced At The Trial

[Here were listed the Exhibits produced by the respective parties during the pre-trial procedure, the description of which is omitted.]

No other documents or factual exhibits will be used at the trial or offered as exhibits except those listed above. It is agreed by counsel for both parties and by the court that the Interpretative Bulletins and other rulings of the Administrator under the Fair Labor Standards Act shall not be used as evidence and are not binding upon the court, but shall be considered by the court in the determination of the issues raised herein, the court to give to such rulings the consideration required of them by law.

The foregoing is certified to be a record of the proceedings had at the pre-trial of this cause, and it is Ordered that the issues to be tried herein shall be those herein set forth as controverted issues.

Dated and entered this 9th day of April, 1941.

James Alger Fee  
United States District Judge

in the aggregate sustained the establishment but was not above cost. These payments were deducted from the employees' wages.

Obviously, if either of these cookhouses were operated by an entirely independent concern, it would be designated as a restaurant and would fall in the class of a retail or service establishment. Such a restaurant would do the majority of its selling or servicing in interstate commerce, irrespective of the fact that meals were sold to the employees of one company only. This factor highlights a fundamental problem. The timber worker is a member of the public. As to meals, he is himself a consumer and purchases food at retail as any other member of the consuming public. This is true whether he is employed or unemployed. The fundamental characteristic of a restaurant is sale at retail to the ultimate consumer in intrastate commerce.

But in this case one circumstance should establish the cookhouses as service establishments. The employees in the woods and the union stipulated that these should be operated at cost and should be self-sustaining. Clearly, the employees actually producing goods for commerce recognize thereby that the cookhouses are maintained for their service and convenience. Under this clause, the burden of any increased wages to cookhouse employees would fall upon those who were engaged in producing goods for commerce. The latter are not required to patronize the cookhouse but it is there for their service if they so desire.

If the buckers and fallers were compelled to eat at a cookhouse and the meals were furnished as a part of the pay, a different situation would be presented. These skilled woodsmen who are paid by the hour and who are not boarded by the company must buy food and service thereof. Any increase in the price of board at the cookhouse will be deducted from the money paid them.

To these factors applicable to both cookhouses, there are special circumstances which relate to the establishment at Glenwood. Although that facility is unquestionably a convenience to the company in keeping the crews fed, it is probably no more so than if it were under entirely independent control. Certainly, it cannot be regarded as a necessary adjunct to defendant's business. This cookhouse caters to persons not in employment of defendant or companies under contract with it. These persons are comparatively few and are charged a higher price. But there is an independent facility, a lunch counter, also located at Glenwood, which is in competition. While this lunch counter could not under present conditions take care of all the trade were the cookhouse closed, its employees are exempt from the operation of the Act, and the possibility of expansion is a circumstance of weight.

Many employees here own their homes and are thus free from the necessity of boarding outside. Some employees live in other places and own cars. These likewise have a choice.

This cookhouse falls under Section 39 of Interpretative Bulletin No. 6:

"Many concerns provide facilities for their employees. In some cases a company operates in its factory a cafeteria or store which is physically separated from the remainder of the plant and is conducted in the same manner as commonly recognized retail or service establishments which are not affiliated with the company. In these cases, the goods or services are sold for cash to the employees, and the store is normally open to the general consuming public. The employer caters to the needs and wants of the employees viewed as part of the general consuming public and not merely as employees. * * *"

There is a sharp differentiation between the conditions at Glenwood and those which prevail at Camp 2. The latter camp is quite isolated. It is seventeen miles from Glenwood. Only a small number of the employees have homes there. Practically it is very difficult for the employees of defendant and companies under contract with defendant to take meals elsewhere. The great majority, in fact, do eat at the cookhouse. Unquestionably, it is more nearly vital for the company to have this eating place there in order to prosecute the production of goods for commerce. There is no independent facility at this camp, and as a practical matter, it would probably be difficult to find any one to embark upon such a business without some favorable arrangement with the company. Although there are exceptions, practically all the patronage of this cookhouse consists of employees of defendant and companies under contract with it.

It is possible to view this establishment as an adjunct of the business of the company, necessary for the production of goods for commerce and the employees as vital to the logging operation.

The Administrator has adopted this view and has issued a ruling which by its terms

apparently covers the situation. This interpretation, in part, reads:

"In these cases the employer does not operate an adjunct which is unrelated to the principal business but the furnishing of the facilities is an integral part of the principal operations. The employer does not satisfy the wants of the employees as part of the general consuming public. Deductions for these facilities are normally made from the cash wages received by the employee. The facilities are not made available to the general public. In these cases, there will not be a separate retail or service establishment within the exemption. Thus, for example, isolated lumber and mining camps operate cookhouses and bunkhouses for employees. These cookhouses and bunkhouses do not serve the general public but are an integral part of the lumber or mining operations." Section 40, Interpretative Bulletin No. 6.

The interpretation is subject to criticism on several bases. First, a service establishment does not change its character even if it is in an isolated spot and of great practical convenience to the employer. Second, the employees of defendant and employees of companies under contract with defendant are the "general public" here, purchasing goods and service at retail, even though the price is deducted from their wages. Third, the skilled workers producing goods for commerce are subjected to a greater burden than they would be if working in a settled community, since the cookhouse is to be self-sustaining for the benefit of workers. Fourth, if the employer were to allow an independently controlled establishment to operate a cookhouse here, the skilled worker would pay retail prices at a higher scale and could not longer exercise an influence on the conduct of the cookhouse. Fifth, the policy should be to encourage employers to operate service establishments, such as gasoline filling stations, swimming pools and beauty parlors at cost to the employees, in order to increase the satisfaction of employees at isolated camps and assist in producing goods for commerce.

Influenced by such considerations, the Administrator has previously taken an opposite position. During the pendency of this case and owing apparently to developments in this controversy, the former ruling was repudiated, notwithstanding the fact that certain courts had made the previous pronouncement the basis for decision. Labates v. The Interstate Company,[2] opinion January 29, 1941, Western District Tennessee, Western Division.

Each party has attacked the interpretation of the Administrator when it did not further his cause and has defended the ruling when it assisted his case. The court believes as a matter of policy the considerations above set out should control as to Camp 2, as well as at Glenwood. Clearly, on the other hand, the last ruling is a permissible one under the language of the statute. There is no question that the Administrator had all the facts before him when it was issued, although he held no hearing. In the nature of things the administrative agency is impressed with the remedial nature of the Act and the urge to carry out the general purpose of Congress. On the other hand, the court is of opinion that exemptions wisely placed in such legislation should be enforced for the protection of the public at large against bureaucratic regulation of matters entirely local in character, such as the purveying of food, to the end that conditions such as those denounced in Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S. Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, shall not again prevail.

■ But the action of the court here is controlled by the declaration of the United States Supreme Court in United States v. American Trucking Associations, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345, where it is said:

"In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involve 'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new'". [Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796.]

This holding is not affected by the fact that in the consideration of the situation, the Administrator has radically changed position.

■ The court, therefore, determines that the cookhouse at Glenwood is a retail or service establishment and employees thereof are exempt, while that at Camp 2 is an adjunct to the production of goods

---

2 No opinion for publication.

for commerce and employees therein are assisting in that process.

The remaining question is whether the scales of computation proferred by plaintiff or defendant be adopted. Neither of those offered by plaintiff is supported by any authority and each leads to results which the court considers unreasonable. On the other hand, the primary plan offered by defendant cannot be accepted because the court cannot find from the evidence that the contract between defendant and these employees contains the terms which are inherent in the basis for this plan. The second plan tendered by the defendant is apparently reasonable. Furthermore, it has the sanction of the Administrator and is adopted on the principles discussed above.

Findings and judgment in accordance herewith will be submitted.